**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00365 (DLF)** |
| **v.** | : | |
| | : | |
| **DOUGLAS K. WANGLER and BRUCE** | : | |
| **J. HARRISON,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM FOR BRUCE J. HARRISON**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, consistent with the plea agreement, the government requests that this Court sentence defendant Bruce J. Harrison to 48 months' probation, $500 restitution, and 40 hours' community service. In a separate memorandum, the government recommends that the Court sentence defendant Harrison's co-defendant, Douglas K. Wangler, to 36 months' probation, $500 in restitution, and 40 hours' community service.

This memorandum is also intended to respond to the Court's December 7 minute order directing the parties to identify similar cases to address the issue of unwarranted sentencing disparities.

I.      **Introduction**

The defendants, Douglas Wangler and Bruce Harrison, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage. Defendants have each pleaded guilty to one

1

violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.

Early in this investigation, the government issued a total of five plea offers in misdemeanor cases that included an agreement to recommend probation. Harrison and Wangler are two of those five rare cases. The defendants accepted the government's offer promptly, and the government is abiding by its prior agreement to recommend probation.

While the riot could not have succeeded without the participation of individuals including defendant and others, the defendants' sentences should reflect their individual roles in the riot. Here, defendants entered the Capitol through an open door that had been breached approximately an hour earlier. Inside the Capitol, the defendants walked to the Crypt and took photographs of themselves. They left about twenty minutes later, through the same door by which they had entered.  The government has not found evidence before or after the riot that defendants espoused or excused violence or insurrection. In addition, before being charged, and without requesting any type of immunity or other consideration, defendants agreed to be interviewed by the FBI and incriminated themselves and each other.  Defendant Harrison did, however, admit to deleting videos and photographs, and, for this reason, deserves a more significant sentence than Wangler.

## II.     Factual and Procedural Background

The factual and procedural background is common to both defendants.

### *The January 6, 2021 Attack on the Capitol*

The government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 34, 35 (Statements of Offense), at ¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

*Douglas Wangler and Bruce Harrison's Roles in the January 6, 2021 Attack on the Capitol*

Shortly before January 6, 2021, Douglas Wangler and Bruce Harrison, two friends, decided to travel together from Illinois to Washington, D.C., to attend the Stop the Steal rally. On January 5, Wangler and Harrison drove to Washington in Harrison's car. They arrived in the late morning that day and attended a rally at Freedom Plaza. On January 6, they attended the "Stop the Steal" rally, arriving before it started. After former President Trump's speech, Wangler and Harrison joined a large crowd of people walking toward the Capitol Building.

Approaching the Capitol on the west side, the defendants saw a violent mob clashing with law enforcement, pushing against bicycle-rack barricades and climbing scaffolding, throwing objects, and spraying police with what they assumed was mace. Harrison also saw one individual spray the police with a red mist, which he knew might be bear spray. Wangler and Harrison walked around scaffolding in place for the inauguration to the Senate Wing Doors. The doors, having been breached approximately 45 minutes earlier, were open. At approximately 3:00 p.m., Wangler walked through the Senate Wing Doors and entered the Capitol Building.



Harrison followed about five seconds later:



Harrison could see broken windows and glass on the ground; Wangler recalled seeing white powder, which he assumed was mace that had been deployed. Harrison held up a tablet and appeared to record a video for a few seconds. Both defendants then turned down a hallway and walked to the Capitol's Crypt. In the Crypt, Harrison took a short video of Wangler standing between a sculpture of John Stark and a marble bust of Abraham Lincoln, in which Wangler pumped his fist in the air and joined a chant of "USA."

4



Harrison sent the video to his wife and some friends.

Walking south from the Crypt, Harrison (left) and Wangler (right) stopped to pose for a photograph next to a bust of George Washington:



Harrison and Wangler then encountered police officers in a hallway. Harrison had a brief interaction with the officers, turned around, and walked back down the hallway.[1]



Wangler and Harrison then returned to the Senate Wing Doors and left the building through those doors at approximately 3:20 p.m., about 20 minutes after they had first entered. Both Harrison and Wangler have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so.

---

[1]    The government is not aware of an audio recording of this interaction, which was captured on Capitol security footage (which does not have audio). The video recording does not indicate that defendants behaved in a hostile or aggressive manner toward law enforcement. In his interview, Harrison said that he had asked police officers in the Crypt for directions to a restroom, but Wangler and Harrison were not able to reach the restrooms because the area was blocked off.

*Defendants' Interviews with the FBI*

On March 10, 2021, two FBI agents attempted to interview Wangler at his home regarding his participation in the Capitol attack. When no one answered, one of the agents left a business card. Five days later, Wangler and Harrison's attorney contacted the FBI and provided an overview of Wangler and Harrison's conduct on January 6.

On April 15, 2021, Harrison and Wangler each sat with the FBI for an interview, without requesting or receiving any sort of immunity. In their interviews, they admitted to their participation in the Capitol attack and traced their path through the Capitol Building. They each described the clashes between rioters and law enforcement they had seen and admitted to the various facts indicating that they were not allowed inside the Capitol Building, such as the breached barricades and clashes between rioters and police. Wangler expressed that the individuals who had committed violence at the Capitol on January 6 had "ruined everything." Harrison indicated that he and Wangler had ultimately decided to leave the Capitol Building because they realized they should not have been inside.

Harrison also admitted that he had attempted to delete videos and photos he had taken in Washington, D.C., once he saw that people who had entered the Capitol Building were "getting into trouble." He did so by clicking "delete," but did not take more advanced measures to remove the videos from his device.

Wangler and Harrison then agreed to turn themselves in and bring the clothing they had worn and electronic devices they had used on January 6 to the FBI. They also agreed to allow the FBI to search the devices, and they expressed interest in pleading guilty.

*Charging and Plea Agreement*

On May 12, 2021, Wangler and Harrison were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Wangler and Harrison turned themselves in to the FBI to be arrested on May 14 and provided the FBI with the agreed-upon items and signed consents to search.

The parties began plea negotiations before defendants had even had their initial appearance in this district on May 28. On June 13, the government extended a plea offer in which it agreed to allocute for a sentence of probation and 40 hours' community service. At this point, no defendants had been sentenced for their participation in the Capitol riot. No misdemeanor defendants had entered guilty pleas, and only two felony defendants had (one of whom pled pursuant to a cooperation plea agreement).

The government sent the formal paperwork for the plea agreement on June 30 and, three days later, Wangler and Harrison returned executed copies. In their plea agreements, each defendant agreed to pay restitution of $500. Because of scheduling issues, the change-of-plea hearing was scheduled for August 31 and was then reset to September 10. On September 10, both defendants entered pleas of guilty.

## III.   Statutory Penalties

Each defendant will be sentenced for a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, each defendant faces up to six months of imprisonment and a fine of up to $5,000.[2]  The defendants must also pay restitution under the terms of their plea agreements; here, they have each agreed to pay $500. *See* 18 U.S.C. §

---

[2]      Because the defendants have pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, it is a "petty offense," 18 U.S.C. § 19, and the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). On balance, consistent with the plea agreement, the government asks the Court to find that the factors here support a sentence of 48 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Harrison has acknowledged that he observed breached barriers and rioters throwing objects at police officers and spraying them with irritants. Once he and Wangler entered the Capitol, Harrison recalled hearing an alarm and seeing broken glass. The signals that should

have led Harrison to turn around and not approach or enter the Capitol were plentiful. While Harrison may have posed for photographs inside the Capitol, no rioter was a mere tourist that day.

While looking at the defendant's individual conduct, however, we must assess such conduct on a spectrum. As noted above, Harrison was among a very small group of defendants (five) who received early plea offers in which the government agreed to recommend probation. To emphasize the uniqueness of this group: the government has extended over 250 plea offers in Capitol riot cases, and over 130 defendants have now entered guilty pleas to misdemeanor charges. Many more cases are pending disposition.

This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. In addition, given the unprecedented scale of this investigation, it is also appropriate for the Court to give consideration to defendants who were among the earliest to agree plead guilty, facing greater uncertainty of outcome and setting a precedent to encourage others to do the same. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to his or her fair and just punishment.

Had a defendant personally engaged in violence or destruction, he or she likely would be facing additional charges and/or penalties associated with that conduct. The absence of violent or

destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases and does not distinguish these defendants from others facing sentencing for the same charge.

The government is recommending probation in this case in light of Harrison's early acceptance of responsibility and agreement to plead guilty. Again, this is one of only five cases where, early in the prosecution, the government agreed to recommend probation. Harrison resolved his case quickly, communicating a willingness to plead guilty before he was even charged. When the government issued its plea offer (which it did only after defendants communicated their interest in pleading guilty), no misdemeanor defendants had entered a guilty plea, and none had been sentenced.

The government credits both defendants for debriefing with the government without requiring any type of immunity. In their debriefs, not only did they admit to entering the Capitol, they also described the violence and disorder they saw outside, voluntarily providing aggravating details. Harrison and Wangler also each consented to a search of their electronic devices, and then quickly agreed to plead guilty. These acts demonstrate an acceptance of responsibility.[3]

In addition, several of the other factors listed above generally would not support a sentence of incarceration. Harrison entered with a large crowd through an open door, well after it had been breached. During the roughly 20 minutes he and Wangler spent inside, they did little aside from walk around and pose for pictures or videos. The evidence of chanting in this case is limited to Wangler chanting "USA." Harrison did not encourage or celebrate violence or property destruction or theft. The government is not aware of evidence that Harrison expressed hostility or aggression toward law enforcement at any point. Nor is there evidence of pre-planning or preparation for a

---

[3]     While the government agrees that Harrison and Wangler fully accepted responsibility in their debrief, neither offered any significant expression of remorse.

riot (such as bringing weapons or tactical gear), coordination with others, or other actions that arguably helped facilitate the riot.

Harrison did send photos and videos from the riot to contacts (including Wangler) using Facebook messenger and text, but did not take to social media or another forum to glorify or excuse the riot or make statements that could have encouraged other rioters. While the use of social media or the public expression of opinion about the riot itself is not a crime, such statements can demonstrate a lack of remorse, encourage others to act illegally, or indicate that a defendant poses an ongoing threat.

There is not a total absence of aggravating factors here, however. Harrison illegally entered the Capitol after having witnessed confrontations between law enforcement and rioters outside that clearly communicated to him that he should turn back. These included personally witnessing a rioter spray the police with a red mist that he believed was bear spray. Harrison, of course, did not turn back.

Harrison's deletion of evidence is also an aggravating factor in his case. He deleted evidence not because of shame about his participation, but because he saw people getting "in trouble." However, the FBI learned of the deletion by Harrison's own admission, and Harrison proceeded to consent to the search of his devices, provided access to his social media, and incriminated himself. These acts demonstrate acceptance of responsibility, somewhat compensating for his initial instinct to hide evidence of his involvement by deleting evidence, although Harrison took these measures only after learning that the FBI had identified his codefendant.

## B. The History and Characteristics of the Defendant

As set forth in the PSR, Harrison does not have any criminal history. If the Sentencing Guidelines did apply to the offense of conviction, his criminal history score would be zero. USSG § 4A1.2(c)(2). He is in compliance with the conditions of his release.

Harrison reported a stable childhood. PSR ¶ 45. He is certified in medical dosimetry (the science of determining radiation dosages) has worked for the same company since September 2002. PSR ¶ 73.

In this case, Harrison's history and characteristics generally militate against a sentence of incarceration, particularly given his lack of criminal history and the early acceptance of responsibility, described above.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  In most cases, including misdemeanor cases, arising out of the January 6 riot, this factor supports a sentence of incarceration. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). Although this specific factor weighs in favor of incarceration, the

---

[4]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

other factors identified in this memorandum indicate that probation is a more appropriate outcome in this exceptional case.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. General deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected president, chosen by the voters (through the Electoral College system). As noted by Judge Moss in *United States v. Paul Hodgkins*, 21-cr-188-RDM, "When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble."  Tr. at 69-70. The attack on the Capitol means "that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Thomas Gallagher*, 21-cr-41 CJN, Tr. 10/13/2021 at 37 ("Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

This was not a protest. These were not tourists. The gravity of the situation demands deterrence. The Court should send a message that there cannot be an attack on our Capitol, on our democratic elections, ever again, and that each individual bears responsibility for not turning back, for joining the mob. It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.

*Specific Deterrence*

As discussed above, however, Harrison's actions at the Capitol that day were more limited than many others.' While Harrison did not approach the FBI until after agents tried to contact Wangler, his willingness to incriminate himself before being charged and then quickly plead guilty weighs in his favor and suggests a lesser need for specific deterrence than in some other cases. Again, the FBI has not uncovered evidence that Harrison sought to glorify or defend the riot, conduct which, in other cases, has given the government cause for concern that defendants may offend again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365

---

[5]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. The government intends for that table, as well as its discussion in this section, to respond to the Court's minute order of December 7 directing the parties to identify similar cases that demonstrate that the recommended sentence is "sufficient but not greater than necessary" under 18 U.S.C. § 3553(a).

(D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

No previously sentenced case contains the same balance of aggravating and mitigating factors present here. Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). As the number of sentences in the Capitol breach misdemeanor cases increases and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

Wangler's and Harrison's cases are comparable to the very small number of other cases (three) where the government agreed, early in the investigation, to recommend probation.[6] *See United States v. Anna Morgan-Lloyd*, 21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 21-cr-97 (PLF); and *United States v. Donna Sue Bissey*, 21-cr-165 (TSC). As noted above, however, each case is unique, and even the probation-recommendation cases do not precisely match the factors at issue here. For example, Valerie Ehrke was inside the Capitol Building for about one

---

[6]     The government recently recommended a sentence of probation in *United States v. Hiles,* 21-cr-155 (ABJ) (ECF No. 34) but did not agree to do so as part of the plea agreement. Hiles received a probation recommendation after cooperating in multiple felony prosecutions.

minute, but she left the building only because law enforcement pushed her out. Gov. Sentencing Mem. *United States v. Ehrke*, 21-cr-97 (PLF), ECF No. 20, at 3.  After the riot, she publicly posted about being pepper sprayed, followed by "lol," using a Q-Anon symbol for her profile photo. *Id.* Wangler and Harrison were in the Capitol Building for a longer period of time, but, when Wangler and Harrison encountered a group of law enforcement officers, by contrast, they spoke with them, turned around, and left the building freely. Harrison did send photos and videos from the riot, but no messages that appear to celebrate or joke about the riot or espouse violence.

Anna Morgan-Lloyd's case shares several parallels with Wangler and Harrison's, in addition to her early agreement to plead guilty.[7]  Gov. Sentencing Mem., *United States v. Morgan-Lloyd*, No. 21-cr-164, ECF. No. 22 at 3 (RCL). After the rally, she marched to the Capitol and entered the building. *Id.* Once inside, she traveled down a hallway and took photographs. *Id.* Morgan-Lloyd agreed to be interviewed with the FBI, admitted she had gone inside the building, and allowed the FBI to search her cell phone. *Id.* at 9. She had no prior criminal history. *Id.* at 7. Distinctions do exist: Morgan-Lloyd entered her guilty plea earlier, and was inside the Capitol for a little over ten minutes; *id.* at 4 n.2; Wangler and Harrison were inside for closer to twenty. Morgan-Lloyd, however, also boasted on social media that she was one of the first 50 rioters inside the building. *Id.* at 3. She described January 6 as the "most exciting" day of her life. *Id.*

---

[7]     Morgan-Lloyd traveled to Washington, D.C. and entered the Capitol with Dona Sue Bissey, for whom the government also recommended a sentence of probation, as noted above. Gov. Sentencing Mem., *United States v. Bissey,* No. 21-cr-165 (TSC), ECF No. 26, at 1 (D.D.C. filed Oct. 4, 2021). Like Morgan-Lloyd, Harrison, and Wangler, Bissey also agreed to an early resolution of her case. *Id.* at 4. Unlike Wangler and Harrison, Bissey had numerous social media posts after the riot, including one where she said she was "proud" to have taken part. *Id.* at 3. Those statements led the court to observe that Bissey did not seem remorseful, and Judge Chutkan imposed 14 days of incarceration (with no probation).

Looking beyond the very small group of defendants who pleaded guilty early and received the government's agreement to recommend probation, Wangler and Harrison lack certain aggravating factors found in many other cases where the government recommended a more significant sentence. Again, they did not take to social media to celebrate or excuse their conduct or attempt to convince others to support their criminal cause, conduct that suggests a greater need for deterrence. Nor does the government have evidence that they resisted law enforcement or encouraged others to do so. Moreover, while many defendants have debriefed with the government as required by their plea agreements, Wangler and Harrison did so before any agreement was on the table; before they had even been charged; and with no promise of any benefit. In their debriefs, they fully admitted their conduct – including, in Harrison's case, the deletion of evidence that serves as an aggravating factor.

For example, the case of Brittany Dillon, where this Court recently imposed a sentence of 60 days' home detention and three years' probation, includes aggravating facts not present here. Text messages Dillon sent before the riot established a clear intent to enter the Capitol to overturn the election results, anticipating civil war and anarchy. Gov. Sentencing Mem., *United States v. Dillon*, No. 21-cr-360 (DLF), ECF No. 21, at 2-3. Dillon attempted to enter the Capitol as part of the initial breach but was repelled by law enforcement with pepper spray and tear gas. *Id.* at 4. After the riot, Dillon's rhetoric remained violent. She described fighting against officers (whom she described as "devils") and said they "got their ass beat by Patriots." *Id.* During her debrief with the FBI, Dillon was not forthcoming regarding her communications. *Id.* at 5.

To take another example, other aggravating factors are also present for Thomas Gallagher, No. 21-cr-41 (CJN), for whom the government recommended a sentence of probation and one month of home detention (he received a sentence of 24 months' probation). As officers retreated

18

down a stairwell to the Capitol Visitor's Center, chairs and objects tumbling around them, Gallagher followed them, carrying a chair. ECF No. 98 at 3. The officers issued commands to leave the building, which Gallagher did not follow. *Id.* at 6. He remained in the Capitol Visitor's Center for approximately nine minutes until officers tackled and arrested him. *Id.* at 9. He consented to a post-arrest interview with the FBI and expressed an early desire to resolve his case. *Id.* Wangler and Harrison had no similarly hostile interactions with law enforcement and, like Gallagher, expressed an early desire to plead guilty.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Finally, when considering sentence disparities, the Court should compare Wangler and Harrison not only to other Capitol riot defendants, but to each other. Here, most of the salient facts that should inform defendants' sentences are the same. Wangler and Harrison decided together to come to Washington and breached the Capitol together. They saw similar red flags as they approached the Capitol Building. Inside the building, they traveled through together. Their

criminal histories are equivalent. They both did not initially turn themselves in, and both then gave full confessions and provided access to their devices. Harrison, however, deleted evidence, which warrants a more severe sentence relative to Wangler.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration, but others support a more lenient sentence. In accordance with the plea agreement, the government recommends that this Court sentence Bruce Harrison to 48 months' probation. The government further recommends that the Court require Harrison to perform 40 hours of community service and pay $500 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Alexis J. Loeb*
ALEXIS J. LOEB
CA Bar No. 269895
Assistant United States Attorney
Detailee
U.S. Attorney's Office
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Office: 415-436-7168
Alexis.Loeb@usdoj.gov